IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| OLD STANDARD LIFE INSURANCE COMPANY IN REHABILITATION, GARY SMITH, Director of the State of Idaho Department of Insurance, in his capacity as Rehabilitator of Old Standard Life Insurance Company in Rehabilitation, OLD WEST ANNUITY & LIFE INSURANCE COMPANY IN REHABILITATION, and CHRISTINA URIAS, Director of the State of Arizona Department of Insurance in her capacity as Receiver of Old West Annuity & Life Insurance Company in Rehabilitation, | |
| Plaintiffs, | ORDER GRANTING, IN PART, AND DENYING, IN PART, LAWYERS TITLE'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DUCKHUNT'S CROSS-MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| DUCKHUNT FAMILY LIMITED PARTNERSHIP, a Nevada limited partnership, | Case No. 2:05-CV-00536 PGC |
| Defendants. | |

DUCKHUNT FAMILY LIMITED
PARTNERSHIP, a Nevada limited
partnership,

      Counter-plaintiff,


        vs.


OLD STANDARD LIFE INSURANCE
COMPANY IN REHABILITATION, GARY
SMITH, Director of the State of Idaho
Department of Insurance, in his capacity as
Rehabilitator of Old Standard Life Insurance
Company in Rehabilitation, OLD WEST
ANNUITY & LIFE INSURANCE
COMPANY IN REHABILITATION, and
CHRISTINA URIAS, Director of the State of
Arizona Department of Insurance in her
capacity as Receiver of Old West Annuity &
Life Insurance Company in Rehabilitation,,

      Counter-defendants.

and
AMERICA WEST TITLE AGENCY, INC., a
Utah Corporation, LAWYERS TITLE
INSURANCE CORPORATION, a Virginia
Corporation, and JOHN DOES 1-5

      Third-party defendants.

---

     This case involves the priority of certain liens on property that is now involved in a

bankruptcy proceeding.  At issue are cross-motions for summary judgment by a defendant and a

third-party defendant.  Initially, third-party defendant Lawyers Title Insurance Corporation filed

for summary judgment with regard to the claims of defendant Duckhunt Family Limited

Partnership.  Duckhunt, who filed a cross-motion for summary judgment, maintains Lawyers Title is vicariously liable for the escrow activities of America West Title Agency, Inc., the insurance agent of Lawyers Title.  Lawyers Title argues Duckhunt's claims fail under Utah law and under common law agency theories.  The court finds the agency relationship between Lawyers Title and American West to be limited enough that no vicarious liability attaches to Lawyers Title under common law.  But material disputed issues remain regarding the escrow instructions, preventing the court from granting summary judgment to either party with regard to Duckhunt's claims under Utah law.

## FACTUAL BACKGROUND

When considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.[1]  When a case involves cross-motions for summary judgment, the court "'construe[s] all inferences in favor of the party against whom the motion under consideration is made.'"[2]  Rather than recite the entire complicated backdrop of this case, the court recites, in brief, the facts relevant to this order.  For the purpose of resolving these competing motions, the court finds the following facts.

Duckhunt was organized under the laws of Nevada.  JW&J Management is a Nevada limited liability company which is the sole general partner of Duckhunt.  Jeanine Wiley is the sole managing member of JW&J.  America West is a Utah corporation.  Lawyers Title is a

---

[1] *See Cortez v. McCauley*, 438 F.3d 980, 988 (10th Cir. 2006).

[2] *Am. Inv. Fin. v. United States*, 364 F. Supp. 2d 1321, 1323 (D. Utah 2005) (quoting *Pirkheim v. First UNUM Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000)).

Virginia corporation, which sells title insurance policies in Utah.

From 2000 to 2002, all times relevant to this action, Lawyers Title and America West had an agency agreement providing that Lawyers Title appointed America West "solely for the purpose of issuing, on Principal's forms, title insurance commitments, policies and endorsements."[3]  The agreement was further limited — it prohibited America West from adopting or using Lawyers Title's name for any purpose, during or after the agreement, and clarified that, in advertising, America West could represent only that America West was a "commitment and/or policy" issuing agent of Lawyers Title.[4]  Additionally, the agency agreement explicitly stated that America West's "escrow business is outside the scope of the agency relationship created by this Agreement."[5]  The agreement reaffirmed this limitation in another section: "any escrow or closing business conducted by [America West] is not within the scope of this Agreement."[6]  America West and Lawyers Title both became involved in the real estate transactions at issue in this case.

The parties' involvement began when, in the fall of 2001, John Benson, a real estate developer, requested a loan from Duckhunt for $300,000.  Mr. Benson had been attempting to purchase and/or complete construction on the Timber Wolf Property, property in Park City, Utah, before the beginning of the 2002 Winter Olympics.  Apparently, Mr. Benson represented that the

---

[3] Docket No. 82, Ex. A, Koloski Aff. 1.

[4] *Id.* at 4.

[5] *Id.* at 5.

[6] *Id.* at 7.

loan would be short-term — due in sixty days.  Mr. Benson agreed to pay fifty percent interest per annum on the loan.  Duckhunt accepted the offer and loaned Mr. Benson the money.

Duckhunt received a promissory note from Mr. Benson in the principal amount of $300,000 on October 19, 2001, and wired $300,000 into the bank account of Equity Title.  Mr. Benson secured the note, which is referred to as the "Duckhunt Trust Deed," by granting a lien on eleven condominium units located at the Timber Wolf Property.  Mr. Benson signed this deed on October 19, 2001.

Before obtaining this loan from Duckhunt, Mr. Benson had obtained a loan from Holladay Bank for $758,000.  Mr. Benson secured that loan with a trust deed, recorded as a lien against four condo units on July 25, 2001.  Mr. Benson next received two construction loans, totaling $3,000,000, relating to his purchase of fifteen units.  Mr. Benson secured this loan with two separate trust deeds, recorded as liens against fifteen units, on October 16, 2001.  Eleven of these units were the same units that later secured the Duckhunt Trust Deed.  The Duckhunt Trust Deed was recorded as a lien against those eleven units on November 6, 2001.  Then, on January 9, 2002, Mr. Benson executed a trust deed conveying a security interest in the fifteen units to Boris London — to secure a $50,000 loan by Mr. London.

Eventually, Mr. Benson sought and received long-term financing on the fifteen units, which replaced a number of these shorter-term loans.  Lawyers Title issued title commitments on the fifteen units to the new lender, MetWest Mortgage Services.  The commitments provided that Lawyers Title would only issue insurance policies if the existing deeds on the property were reconveyed.

America West's settlement agent, Tracy Cottle, executed fifteen escrow statements relating to the properties on January 23, 2002.  The statements detailed the refinancing of the fifteen units.  Fifteen different balance sheets were prepared, detailing the escrow transactions. Next, fifteen promissory notes totaling the refinance amount of $4,461.000 were prepared, and fifteen corresponding trust deeds were recorded on January 24, 2002.  Lawyers Title then issued a formal title policy on each of the trust deeds at closing, pursuant to its former title insurance commitments.  MetWest's closing instructions required America West "to clear title of all liens and encumbrances to ensure the Lender holds a valid 1st lien position, subject only to title exceptions provided/accepted by Lender's legal counsel."[7]

Before the closing, Mr. Benson wanted America West to act as the trustee of the trust deeds because America West would handle the long-term financing for Timber Wolf.  America West prepared a substitution of trustee form, in preparation for the refinancing.  Duckhunt signed this substitution of trustee form.  Then, during the closing, America West caused more than $3,000,000 to be paid out of escrow for liens against Timber Wolf Property, but Duckhunt received no payments for its note.

This case originally came before the court when plaintiff Old Standard Life Insurance Company in Rehabilitation, along with other co-plaintiffs, filed a complaint under diversity jurisdiction to determine priority of certain trust deeds and liens on the Timber Wolf Property. Duckhunt, in turn, filed its Answer, Counterclaim, and Third-party Complaint.  Duckhunt denied a large portion of Old Standard's allegations and filed its own claims for relief.  Duckhunt also

---

[7] Docket No. 129, Mem. in Opp'n to Mot. for Summ. J., Ex. Q, at 2 (emphasis omitted).

included two third-party defendants — America West and Lawyers Title — in its counterclaim,

seeking to be paid on Mr. Benson's note.  Because America West had been properly served with

Duckhunt's third-party complaint, but failed to answer or otherwise respond, the court granted

Duckhunt's request that the court enter default judgment against America West.  Duckhunt's

judgment against America West remains unsatisfied.  Duckhunt's claim before the court is that

Lawyers Title is liable to Duckhunt for America West's allegedly improper distribution of money

from escrow to those with interests junior to Duckhunt's.  Lawyers Title first filed for summary

judgment on these claims, then Duckhunt filed a cross-motion for summary judgment.

### STANDARD OF REVIEW

The court should grant summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."[8]  In determining the appropriateness of summary judgment, the court must "view the

evidence, and draw reasonable inferences therefrom, in the light most favorable to the non-

moving party."[9]  However, "[t]he mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must

be evidence on which the jury could reasonably find for the plaintiff."[10]

---

[8] Fed. R. Civ. P. 56(c).

[9] *Combs v. PriceWaterhouse Coopers, LLP*, 382 F.3d 1196, 1199 (10th Cir. 2004).

[10] *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

**DISCUSSION**

In this diversity action, both parties frame their arguments under Utah law, thereby acceding that Utah law governs the substantive issues.  Duckhunt claims Lawyers Title is liable under both common law and Utah law for America West's allegedly improper distribution of escrow funds.  Although a reasonable trier of fact could not find Lawyers Title liable to Duckhunt under common law agency theories, due to disputes about material facts, the court cannot grant summary judgment to either party with regard to Duckhunt's claims under Utah's section 31A-23a-407.

  A.  *Lawyers Title's Motion to Strike Affidavit*

As an initial matter, Lawyers Title has moved to strike the affidavit of Jeremy Parsons that Duckhunt submitted in support of its opposition to Lawyers Title's motion for summary judgment.  In the affidavit, Mr. Parsons states, "It was my understanding that John Benson was going to refinance several of the buildings in Timberwolf and that America West required that Jeanine Wiley sign a substitution of trustee before it could act as her agent during the refinance process."[11]  Lawyers title objects that this statement is based on Mr. Parsons' subjective understanding, is conclusory, and lacks foundational support.  Duckhunt filed no response to Lawyers Title's motion to strike, failing to address these objections at all.  The court, therefore, grants Lawyers Title's motion to strike Mr. Parsons' affidavit.

---

[11] Docket No. 122, Mem. in Opp'n to Mot. for Summ. J., Ex. U, at 3.

*B.      Liability of Lawyers Title Under the Doctrine of Respondeat Superior*

In its complaint, Duckhunt contends that America West possessed express, apparent, and implied authority under common law to act as Lawyers Title's agent in escrow dealings.  Based on this, argues Duckhunt, Lawyers Title should be held liable for America West's allegedly improper payout.  The court finds that Duckhunt has not presented evidence sufficient for a trier of fact to reasonably find America West possessed express, apparent, or implied authority to act as Lawyers Title's escrow agent.

As an initial matter, no evidence supports Duckhunt's claim that America West had express authority to conduct escrow business on Lawyers Title's behalf.  The only support Duckhunt provides for this contention is that Lawyers Title sold lenders' policies in connection with the refinancing by MetWest.  But title insurance business and escrow business are two very different things under Utah law, although Duckhunt's arguments conflate the concepts.  In other words, the undisputed fact that Lawyers Title appointed America West to engage in title insurance production on its behalf fails to support an inference that Lawyers Title granted America West authority to conduct escrow business on its behalf.  Utah law defines "title insurance" as:

> [T]he insuring, guaranteeing or indemnifying of owners of real or personal property or the holders of real or personal property or the holders of liens or encumbrances on that property, or others interested in the property against loss or damage suffered by reasons of liens or encumbrances upon, defects in, or the unmarketability of the title to the property, or invalidity or unenforceability of any

liens or encumbrances on the property.[12]

Title insurance is meant to indemnify insureds against losses due to title defects.[13]  "Escrow" on

the other hand, means:

> any agreement, express or implied, that provides for one or more parties to deliver
> or entrust any money, certificate of deposit, security, negotiable instrument, deed,
> or other property or asset to another person to be held, paid, or delivered in
> accordance with terms and conditions prescribed in the agreement.[14]

Because these are distinct concepts, engaging in escrow does not necessarily require dealings in

title insurance.

 The Utah Court of Appeals recognized as much in *Bodell Construction Co. v. Stewart

Title Guaranty Co.*[15]  Among other things, *Bodell* involved various plaintiffs' claims that Stewart

Title should be held vicariously liable for the actions of its title insurance agent, First Title.  The

plaintiffs claimed First Title's actions led to a diversion of funds, which caused them to suffer

financial damage.[16]  The facts underlying *Bodell* show that First Title and Stewart Title entered

into an agreement expressly limiting First Title's agency authority to the issuance of insurance

---

[12] Utah Code Ann. § 31A-1-301(156).

[13] *Valley Bank & Trust Co. v. U.S. Life Title Ins. Co. of Dallas*, 776 P.2d 933, 935–36 (Utah App. 1989).

[14] Utah Code Ann. § 7-22-101.

[15] 945 P.2d 119 (Utah Ct. App. 1997).

[16] *Id.* at 123.

policies and commitments on Stewart Title's behalf.[17]  The title companies' agreement specifically prohibited First Title from representing to the public that it acted as the agent of Stewart Title with regard to any escrow business.[18]  Also, Stewart Title never represented that First Title possessed authority to act as Stewart Title's agent with regard to escrow.[19]  Based on the agreement between the parties that distinctly limited their agency relationship, the court determined First Title had no authority to act as Stewart Title's agent for purposes of conducting escrow business.[20]

Similar to the parties in *Bodell*, the written agency agreement between Lawyers Title and America West created an agency relationship for the limited purpose of issuing title commitments and title insurance policies on real estate transactions in certain counties within Utah.  The plaintiff in *Bodell* did not argue First Title had express authority to conduct Stewart Title's escrow business, presumably because the lack of express authority was clear.  Similarly, the lack of express authority of America West to conduct Lawyers Title's escrow business is clear.  When Lawyers Title appointed America West as its agent, it specifically prohibited America West from acting as its agent with regard to escrow.  In two places, the written agency agreement explicitly noted that any escrow or closing business conducted by America West falls

---

[17] *Id.* at 122.

[18] *Id.*

[19] *Id.*

[20] *Id.* at 124.

outside the scope of the parties' agency relationship.  Duckhunt has presented no evidence

negating these plain limitations in the agreement.  Therefore, America West possessed no express

authority to conduct escrow business on the behalf of Lawyers Title, and no reasonable trier of

fact could find otherwise.

Duckhunt also claims that the fact that America West sold the title insurance policies of

Lawyers Title shows America West possessed apparent authority to handle escrow transactions.

In *Bodell*, the Utah Court of Appeals also addressed the issue of apparent authority.  In rejecting

the plaintiffs' claim that First Title possessed apparent authority to conduct escrow business on

Stewart Title's behalf, the court concluded that apparent authority must flow from the principal.[21]

> "The authority of the agent [is not] 'apparent' merely because it looks so to the
> person with whom he deals.  It is the principal who must cause third parties to
> believe that the agent is clothed with apparent authority. . . .  It follows that one
> who deals exclusively with an agent has the responsibility to ascertain that agent's
> authority despite the agent's representations."[22]

Applying this to the facts, the court determined that First Title's use of Stewart Title's name

provided no apparent authority to First Title to act as Stewart Title's agent in escrow and that any

appearance of authority came from First Title, not Stewart Title.[23]  The court also admonished the

---

[21] *Id.*

[22] *Id.* (alterations in original) (quoting *Zions First Nat'l Bank v. Clark Clinic Corp.*, 762
P.2d 1090, 1095 (Utah 1988)).

[23] *Id.*

plaintiffs for failing to ascertain the scope of First Title's authority.[24]

In this case, Duckhunt has provided no evidence to support a theory of apparent authority, beyond that which First Title provided to the Utah Court of Appeals.  In other words, Duckhunt has alleged America West used Lawyers Title's name on its paperwork, but never asserted Duckhunt had any contact with Lawyers Title.  And the agency agreement between America West and Lawyers Title even limited America West's use of Lawyers Title's name.  Further, Duckhunt provided no evidence of actions by Lawyers Title that would cause Duckhunt to believe America West had apparent authority to conduct escrow business on its behalf.  Moreover, Duckhunt, who dealt exclusively with America West — and even then, only in a limited sense — does not appear to have complied with its duty to ascertain the scope of America West's authority.  Under *Bodell*, no trier of fact could reasonably find apparent authority existed in these circumstances.

Similarly, no reasonable trier of fact could find America West possessed implied authority to conduct escrow business on behalf of Lawyers Title.  Returning again to *Bodell*, it becomes clear that, as a matter of law, Duckhunt has failed to make a sufficient showing of implied authority.  In *Bodell*, the Utah Court of Appeals clarified that "'[i]mplied authority . . . embraces authority to do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent.'"[25]  Rejecting the

---

[24] *Id.*

[25] *Id.* (alterations in original) (quoting *Zions First Nat'l Bank*, 762 P.2d at 1094.)

plaintiffs' argument that transactions involving escrows are necessary to issuing title insurance, the court recognized that while "issuing title insurance typically occurs concurrently with escrow, closing and settlement functions, this does not necessarily make them mutually inclusive."[26] Because the agency agreement between Stewart Title and First Title limited First Title's authority to the execution and issuance of title insurance policies, the court found no implied authority for First Title to conduct escrow transactions on Stewart Title's behalf.[27]

Lawyers Title also expressly limited America West's authority to the issuance of title insurance policies.  Under *Bodell*, as a matter of law, these facts cannot and do not support a finding of implied liability.  The court cannot hold Lawyers Title liable for the alleged escrow misconduct of America West under common law when Lawyers Title so carefully limited the scope of America West's authority to title insurance.

Duckhunt also argues Utah's section 31A-23a-405 supplies a basis for Lawyers Title's liability, but this statute is limited to the scope of the agency relationship.  Specifically, section 31A-23a-405 creates a "rebuttable presumption that every insurer is bound by any act of its appointed licensee performed in this state *that is within the scope of the appointed licensee's actual (express or implied) or apparent authority*, until the insurer has canceled the appointed licensee's appointment."[28]  Considering that escrow activities fell outside the scope of Laywers

---

[26] *Id.* at 125.

[27] *Id.*

[28] Utah Code Ann. § 31A-23a-405 (emphasis added).

Title's relationship with America West, this statute is not helpful to Duckhunt.  By its own terms, this section limits the rebuttable presumption that an insurer is bound by the acts of its agent to acts within the scope of the agency relationship, so if there is no common-law agency relationship, there can be no liability under this statute.

Utah's section 31A-23a-406(1)(b) is similarly unhelpful for Duckhunt.  This section provides that a "title insurance producer may do escrow involving real property transactions if all of the following exist: . . . (b) the title insurance producer is appointed by a title insurer authorized to do business in the state."[29]  Duckhunt argues that in conjunction with section 31A-23-405, this provision operates as a legal presumption that Lawyers Title is bound by escrow-related acts of America West.  Duckhunt reads too much into this statute.  This statute merely means that title insurance producers may only engage in escrow business if they meet certain requirements.  In other words, to perform escrow services, a title insurance agent must have a valid appointment from an underwriter.  However, this does not mean that a title insurance agent *must* conduct escrow services simply because it has a valid appointment, or that a title insurance agent must conduct escrow services if it is to issue title insurance.  This section simply does not apply to the agency relationship between Lawyers Title and Duckhunt — a relationship limited to the provision of title insurance.

In sum, Duckhunt has not provided evidence sufficient for a reasonable trier of fact to find that America West possessed express, apparent, or implied authority to act as Stewart Title's

---

[29] *Id.* § 31A-23a-406(1)(b).

agent in escrow transactions.  Lawyers Title's agency relationship with America West was too limited for such a finding.  Accordingly, the court cannot, as a matter of law, hold Lawyers Title vicariously liable under common law agency theories for any misconduct by America West.

    *C.*    *Section 31A-23a-407*

In addition to its common-law-agency claim against Lawyers Title, Duckhunt argues Lawyers Title is liable under a Utah statute holding title insurance companies liable for mistakes or improper acts pertaining to real estate escrow transactions.  Specifically, section 31A-23a-407 provides:

> Any title company, represented by one or more title insurance producers, is directly and primarily liable to others dealing with the title insurance producers for the receipt and disbursement of funds deposited in escrows with the title insurance producers in all those transaction where a commitment or binder for or policy or contract of title insurance of that title company has been issued or distributed. This liability does not modify, mitigate, impair, or affect the contractual obligations between the title insurance producers and the title insurance company.[30]

But Lawyers Title maintains this statute violates the uniform operation of laws provision of the Utah Constitution,[31] because it creates an arbitrary and unconstitutional classification leading to unequal treatment of those in the same circumstances.

    1.    Constitutionality of Section 31A-23a-407

The uniform operation of laws provision of the Utah Constitution requires "[a]ll laws of a

---

[30] *Id.* § 31A-23a-407.

[31] Utah Const., art. I, § 24.

general nature [to] have uniform operation."[32]  To assess the validity of a statute under this

provision, the court must consider: (1) the reasonableness of the classification, (2) the legitimacy

of the objectives of the legislative action, and (3) the reasonableness of the relationship between

the classification and the legislative purpose.[33]  Mounting a challenge to any Utah statute is

difficult because under Utah law, "all statutes are presumed to be constitutional and the party

challenging a statute bears the burden of proving its invalidity."[34]  "The burden of demonstrating

unconstitutionality . . . remains a heavy one."[35]

    Prongs one and two in the assessment of section 31A-23a-407's validity under the

uniform operation of laws provision are not disputed.  With regard to prong one, no parties have

argued the objectives of the insurance code are illegitimate.  The stated purposes of Utah's

Insurance Code, among other things, are to "ensure that policyholders, claimants, and insurers are

treated fairly and equitably,"[36] to "encourage self regulation of the insurance industry,"[37] and to

"encourage loss prevention as part of the insurance industry."[38]  With regard to prong two,

---

[32] *Id.*

[33] *Ryan v. Gold Cross Servs., Inc.*, 903 P.2d 423, 426 (Utah 1995).

[34] *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 637 (Utah 1989).

[35] *State v. Mohi*, 901 P.2d 991, 996 (Utah 1995) (citation omitted).

[36] Utah Code Ann. § 31A-1-102(2).

[37] *Id.* § 31A-1-102(8).

[38] *Id.* § 31A-1-102(9).

section 31A-23a-407 distinguishes between title insurance companies with title insurance producers that conduct escrow and other parties that conduct escrow.  For the purposes of its motion, Lawyers Title accepts that there is nothing inherently unreasonable about distinguishing between types of companies that conduct escrow business.

The parties' viewpoints diverge with regard to the third prong — whether the relationship between the classification and the legislative purpose is reasonable.  When reviewing the constitutionality of economic regulations such as section 31A-23a-407, courts give "broad deference to the legislature when scrutinizing the reasonableness of its classifications and their relationship to legitimate legislative purposes."[39]  This broad deference requires courts to sustain classifications where "facts can reasonably be conceived which would justify the distinctions or differences in state policy [expressed by the challenged legislation] as between different persons."[40]  The legislature has "considerable discretion in the designation of classification,"[41] and the court must resolve any doubts about a statute in favor of its constitutionality.[42]

Lawyers Title does not argue this law fails to apply equally to members of the class the law creates.  Rather, Lawyers Title argues the statute treats separate classes differently while failing to reasonably further the legislature's objectives.  The statute creates a class that includes

---

[39] *Blue Cross*, 779 P.2d at 637.

[40] *Id.* (alterations in original) (citation and internal quotations omitted).

[41] *State* ex rel. *Z.C. v. State*, 2005 UT App. 562, ¶ 13, 128 P.3d 561, 565.

[42] *Id.* ¶ 10.

title insurance companies with title-insurance-producer agents that perform escrow and excludes both those who are not title companies and title companies without agents.  There is no rational basis for this distinction, contends Lawyers Title: "The suggestion that consumers need to have greater protection from title insurance agents who handle escrow than they do from other companies or persons that handle escrow is simply not rational."[43]

In response to Lawyers Title's challenge to this statute, the Utah Insurance Department intervened in the case for the specific purpose of defending the statute's constitutionality.  And the Insurance Department has advanced a reasonable connection between the classification and the purpose of the legislation sufficient to uphold the statute.  The Insurance Department argues the distinction in the statute is valid because title insurance companies are not similarly situated to other parties from the viewpoint of the consumer.  For example, if a consumer meets with an attorney, the consumer knows she is dealing with the attorney and the firm, not any other entity. She knows where she can seek recompense for any damages she suffers.  But if a consumer consults with a title insurance producer with regard to escrow, the consumer may think she is directly dealing with the title insurance company.  Utah courts have recognized that title insurance is typically issued concurrently with escrow, closing, and settlement transactions.[44] Moreover, title insurance producers must, by law, sell title insurance to consumers in addition to

---

[43] Docket No. 133, Reply in Support of Mot. for Summ. J. 29.

[44] *Bodell*, 945 P.2d at 125.

performing escrow work.[45]  Every escrow transaction, therefore, necessarily involves the sale of

title insurance from a title company.  This lends to the impression the title insurance company is

tied into the escrow process even if, in fact, it is not.

Section 31A-23a-407, therefore, creates an agency relationship where one does not

otherwise exist to meet with consumer perceptions.  As Lawyers Title points out, in some cases,

a title insurance company will have disclaimed an escrow relationship with the title insurance

producer.  In such cases, the unsuspecting consumer — who may have no understanding that the

title insurer is not involved in the escrow process — will have no common law agency claims

against the title insurance companies.  Protecting these expectations of the consumer by ensuring

she can seek redress from the parties she thought she was directly dealing with, reasonably relates

to the purpose of encouraging fair and equitable treatment of policyholders and claimants.[46]  The

court finds, therefore, that making title insurance companies answerable for the escrow-related

wrongs of the title insurance producers is sufficiently tied to legislative goals that it comports

with Utah's uniform operations of law provision.

Lawyers Title relies heavily on the unpublished opinion of Judge J. Dennis Frederick,

from the Third Judicial District Court, State of Utah, in support of its claim of

unconstitutionality.[47]  Even considering Judge Frederick's opinion, the court finds Lawyers Title

---

[45] *See* Utah Code Ann. § 31A-23a-406(1)(c).

[46] *See id.* § 31A-1-102(2)

[47] *See*  Docket No. 81, Mem. in Support of Mot. for Summ. J., Ex. A, at 6–7.

has failed to meet its heavy burden.  Judge Frederick addresses the constitutionality of section 31A-23a-407 in one short paragraph, concluding that because people other than title insurance producers handle escrows, there is no rational basis for imposing strict liability on title companies for only those closings handled by title insurance producers.[48]  However, because this court can reasonably conceive of facts "which would justify the distinctions or differences in state policy [expressed by the challenged legislation] as between different persons,"[49] the court must sustain this classification.  It is not this court's function "to defend the merits, desirability, or rationality of legislative action"[50] or to evaluate whether the legislature picked the best means by which to protect the largest number of consumers.

Ultimately, because the court finds a reasonable connection exists between the legislative purpose and the classification in the statute, the court must uphold the statute's constitutionality.

### 2.  Duckhunt's Liability Under Section 31A-23a-407

Duckhunt argues Lawyers Title is liable under section 37A-23a-407 because America West erred in managing the escrow during the Timber Wolf Property refinance.  However, because Duckhunt has failed to proffer uncontroverted evidence that America West improperly distributed the escrow funds, the court cannot grant summary judgment to Duckhunt.  And

---

[48] *See id.*

[49] *Blue Cross*, 779 P.2d at 637 (alterations in original) (citation and internal quotations omitted).

[50] *Gold Cross*, 903 P.2d at 426.

similarly, because Lawyers Title has failed to prove, with uncontroverted evidence, that America West acted properly, the court cannot grant summary judgment to Lawyers Title.

Under section 31A-23a-407, a title insurance company faces liability for a title insurance producer's wrongful escrow activities even if the parties' agreement disavows such a relationship.  Although the statute does not directly hinge the title company's liability on a showing of liability by the title insurance producer, it can be read no other way.  To avoid absurdity, the statute must not hold the title company liable for acts for which the producer could not be independently liable.

Although Utah courts have not addressed this issue directly, the Utah Court of Appeals has applied section 31A-23a-407 in this manner.  In *Bodell*, the court of appeals rejected the plaintiffs' attempt to hold a title company liable for the acts of its title insurance producer.[51] Apparently, Stewart Title underwrote a number of title insurance policies in real estate transactions involving the plaintiffs.[52]  With regard to one transaction in which First Title was the escrow holder, the real estate agent directed First Title to disburse its commission to pay some of the debts of defendant Vernon George.[53]  Then, First Title conducted two property closings that resulted in "phantom equity" for Mr. George.[54]  The plaintiffs sued First Title and Stewart Title,

---

[51] 945 P.2d at 125.

[52] *Id.* at 121–22.

[53] *Id.* at 122.

[54] *Id.*

among other defendants, for damages suffered due to Mr. George's diversion of funds from the real estate transactions.[55]

The plaintiffs based their claims against Stewart Title on section 31A-23-308 of the Utah Code.[56]  This section has since been renumbered as 31A-23a-407.[57]  The *Bodell* court summarily disposed of any claim against Stewart Title not involving the disbursement of funds, as falling outside the scope of the statute.[58]  The court similarly disposed of a transaction in which Stewart Title had not issued an insurance commitment.[59]  Finally, the court reviewed Stewart Title's liability for the remaining claims in light of the propriety of First Title's actions.  First Title, according to the court, simply followed closing instructions in the transactions that created phantom equity.[60]  And with regard to the disbursement of the real estate agent's commission, First Title, again, simply followed escrow instructions.[61]  Because the plaintiffs failed to "establish[] that First Title was doing anything more than following instructions," the court

---

[55] *Id.* at 122–23.

[56] *Id.* at 123.

[57] *Big Sky Fin. Co. v. Lawyers Title Ins. Corp.*, 2006 UT App 337, 337 n.1.

[58] 945 P.2d at 123.

[59] *Id.* at 123–24.

[60] *Id.* at 124.

[61] *Id.*

concluded "no liability, much less vicarious liability, is incurred."[62]   In other words, without a showing of liability on the part of the title insurance producer, section 31A-23a-407 cannot sustain liability on the part of the title company.   The *Bodell* court based its finding of no liability solely on the fact that the plaintiff had failed to prove the title producer had done something other than follow the escrow instructions.

With this in mind, the court is unable to grant either party summary judgment on this claim — neither party has made a sufficient, uncontroverted showing that America West acted properly or that it acted wrongly.   Because both parties gloss over facts that appear to be dispositive of this issue, the court has no choice but to conclude these material facts remain disputed at this point.   It is undisputed that MetWest directed America West to "clear title of all liens and encumbrances to ensure that Lender holds a valid 1st lien position, *subject only to title exceptions provided/ accepted by Lender's legal counsel*."[63]   It is also undisputed that America West followed the distribution instructions on the settlement statements, which provided for no payments to Duckhunt.   The vital issue, therefore, is whether the specific payouts in the settlement statements were directed by the plaintiffs or by America West — in other words, *how* exactly Duckhunt came to be a stranger to the escrow.

Lawyers Title alleges the plaintiffs and Mr. Benson directed America West to distribute the funds in escrow in accordance with the settlement statements.   Viewing the facts in the light

---

[62] *Id.*

[63] Docket No. 122, Mem. in Opp'n to M. for Summ. J., Ex. Q, at 2 (emphasis in original).

most favorable to Laywers Title, in such a circumstance, America West would simply be following escrow instructions by omitting payment to Duckhunt.  Under *Bodell*, such actions would be legitimate, as a matter of law.  No liability would result for America West — and no vicarious liability for Laywers Title.  On the other hand, if, as Duckhunt alleges, an agent of America West created the settlement statement, then America West cannot be said to have simply followed the escrow instructions when it omitted payment to Duckhunt.  If America West failed to comply with MetWest's directions by unilaterally excluding payment to Duckhunt, Lawyers Title may be vicariously liable.

It is important to emphasize that even if America West's compliance with the escrow instructions were not at issue, at this point, Duckhunt has not supplied sufficient evidence to establish America West's liability.  The court has already entered a default judgment against America West, so such a finding would not affect America West's actual liability in this case. But the entry of a default judgment does not show the kind of wrongful behavior by America West necessary for a finding of vicarious liability by Lawyers Title.   Without a showing of wrongful behavior on the part of America West, no liability can be imputed to Lawyers Title under section 31A-23a-407.  Other than a reference to a California case that says a party can face contractual liability for failure to follow escrow instructions[64] and a few vague references to whether Duckhunt was an intended beneficiary of the escrow, the parties fail to address the issue

---

[64] *See Summit Fin. Holdings, Ltd. v. Continental Lawyers Title Co.*, 41 P.3d 548, 551 (Cal. 2002).

of America West's liability to Duckhunt at all.

Because disputed issues of material fact remain with regard to the escrow instructions and the propriety of America West's conduct, the court must deny the parties' motions for summary judgment on this claim.  This denial comes without prejudice to the refiling of such motions after the parties can present the court with a fuller factual record, but before the dispositive motions deadline of April 2, 2007.

> D.      *Late Filings by Duckhunt*

Just as the court was finalizing its lengthy opinion, Duckhunt filed multiple pleadings relating to the motions at issue in this order.[65]  Duckhunt requested no time extension and provided no explanation for these late filings.  Due to their untimeliness, the court finds it necessary to strike these pleadings.

First, Duckhunt filed an objection to Lawyers Title's motion to strike Mr. Parson's affidavit and filed an affidavit of Tracy Cottle in conjunction with this motion.  But Lawyers Title filed its motion to strike Mr. Parsons affidavit on October 30, 2006.[66]  Under local rules, absent extension by the court, Duckhunt should have filed any opposition to this motion within fifteen days.[67]  Instead, Duckhunt filed its pleading forty-four days later — on December 13, 2006.  Next, Duckhunt filed a motion to strike the affidavit of John Benson insofar as Lawyers Title relied on

---

[65] *See* Docket Nos. 147–51.

[66] *See* Docket No. 135.

[67] *See* D.U. Civ. R. 7-1(b)(3).

it.  Lawyers Title submitted Mr. Benson's affidavit on October 30, 2006.[68]  Any objections to its validity needed to be filed long before now.  Finally, Duckhunt filed a reply memorandum in support of its cross-motion for summary judgment.  But Lawyers Title submitted its opposition to Duckhunt's motion for summary judgment on October 30, 2006.[69]  According to local rules, Duckhunt had ten days — not forty-four days — in which to reply to this opposing memorandum.[70]

The purpose of the time limits in the local rules is to give the parties an opportunity to respond to motions and to inform the court of when motions are ripe for a decision, all while preventing unreasonable delay.  If parties, of their own accord, could endlessly extend their own filing periods, the court could never be sure what issues or arguments were before it.  This would hamper the court's ability to undertake a thorough review of the case, would lead to unreasonable delay, and would prevent the court from issuing a cogent decision.  The court, therefore, must strike these late-filed pleadings as untimely.

## CONCLUSION

Based on the foregoing, the court GRANTS Lawyers Title's motion to strike Mr. Parsons' affidavit [#135].  In addition, the court GRANTS Lawyers Title's summary judgment motion as it pertains to Duckhunt's common law claim against it (Duckhunt's tenth claim for relief) [#80].

---

[68] *See* Docket No. 136.

[69] *See* Docket No. 134.

[70] *See* D.U. Civ. R. 56-1(b).

With regard to Duckhunt's claim of statutory liability (its ninth claim), the court DENIES both

parties' motions for summary judgment [#80, #119] without prejudice.  Finally, the court

STRIKES Duckhunt's late-filed pleadings [#147, #148, #149, #150, #151], as they were untimely

filed.

     SO ORDERED.

     DATED this 14th day of December, 2006.

              BY THE COURT:

              _____
              Paul G. Cassell
              United States District Judge